STEAGALL, Justice.
Plaintiffs Earline Nall and LaWanda Nall appeal from the judgment entered on the jury verdict in favor of defendants Larry Tisdale and Murray Envelope Corporation in the Nalls’ suit alleging negligence and wantonness in regard to an automobile collision on Interstate Highway 65. The Nalls argue on appeal that the trial judge erred in denying their motion for a new trial and in charging the jury on the “sudden emergency doctrine.”
On January 8, 1988, the Nalls and Tis-dale were headed south on Interstate 65 amid severe ice and snow. LaWanda Nall was driving a 1986 Toyota Cressida automobile, in which her mother, Earline, was a passenger, and Tisdale was driving a truck owned by Murray Envelope Corporation. Both vehicles had just crossed the Tennessee-Alabama state line into Limestone County, Alabama, when the accident occurred. It is undisputed that the right front of Tisdale’s truck struck the rear end of the Nall vehicle. However, the Nalls’ account of how the wreck occurred differs significantly from that of Tisdale and two eyewitnesses.
*467 La Wanda Nall testified as follows regarding the accident:
“When I made it to the Elkmont exit, just as I went under the overpass just a few feet, I realized that there was almost solid ice when I came upon that section of the highway. There was only one set of ruts, only one lane open, and it was in the middle of the highway or what appeared to be the center of the highway. I was traveling in those ruts. I went, I would say, probably three [or four] tenths of a mile from the overpass and I looked up in my rear view mirror and I saw the lights, the little orange lights that go across the top of an eighteen wheeler. That’s how I knew it was a large truck coming up behind me. It was moving very fast. I could tell the way he was gaining speed on me [that] he was going a lot faster that I was. I was traveling between ten and fifteen miles an hour. I had turned my hazard lights on when I came under the overpass. I hit the ice and I had to slow down. My hazard lights were on, and I thought the vehicle approaching behind me could see that I was stopped almost to a creep because it [sic; I?] was just moving, barely moving. I looked at my mother and I said, ‘That truck is coming up very fast on us. I hope he can get stopped.’ She said, ‘Oh, don’t worry about it. Nobody is going to try to gain speed on you tonight. Everybody is driving cautiously because of the conditions.’ She leaned up and looked out the rear view mirror on her side, and she could see the truck’s headlights. After she made that statement, I looked back up in the rear view mirror and he was just a few feet from me. He was over to the right of my car, and he appeared as if he was going to try to pass me on the right side. I looked at her and said, ‘[He] is going to try to pass me.’ She said, ‘Oh, no. Nobody is going to try to pass you tonight.’ Within just a second or two after she made that statement we were hit. I braced when I saw him coming. I didn’t have time to say, ‘Hold on.’ We were hit that quick after she made that statement.”
Earline Nall’s testimony substantially corroborated that of her daughter.
On the other hand, Tisdale, as well as the two eyewitnesses to the accident, Jerry White and Thomas Boyd, stated essentially that the Nall vehicle was out of control, that it pulled in front of Tisdale’s truck, and that the truck swerved to the left, toward the median, in an effort to avoid it. Tisdale testified as follows:
“Well, Ms. Nall, at the time she was sitting still, when I made my approach coming south seeing her out of control of her vehicle sitting still almost in the median, when I came in front of her, which she was headed west, she [gave] the car gas by her own admission at the scene. She said she locked her emergency brake or hand brake, causing the front wheels of her vehicle to lock, causing the back wheels to give momentum to spin around lengthwise and parallel with me. She realized she said she was going to either hit the truck broadside or go into the ditch on the far right side. I turned to the left to try to avoid hitting her broadside. In the meantime, her vehicle was moving and mine was moving to the left, and that caused the right corner to strike it.”
White recounted the accident as follows:
“Q. Mr. White, where were you living back at the time we had the big snow back in January of 1988?
“A. I was living right across from the accident across the interstate.
“Q. You were living next to ... Interstate 1-65?
“A. Right.
“Q. Were you a witness to this accident?
“A. Right.
“Q. Pardon me?
“A. Right, yes, sir.
“Q. What were you doing that evening about 6:30 P.M.?
“A. At 6:30 that evening, I was out there helping somebody, trying to get somebody going.
“Q. Get somebody going?
*468 Uh-huh. !>
What had happened to them? <©
They got stranded going north. i>
Got stranded going north? <©
Uh-huh. i>
Okay. When you say you were helping him get going, what were you doing? <©
I was trying to help push the car, get it straightened out to where he could go on. I was in the median after we got it going, and after I got back in the median is when I [saw] the accident.
That’s when you saw the accident? <3*
Right. <
Well, tell the ladies and gentlemen of the jury what you saw. G?
Okay. What I saw when I got in the median is the car [came] around the truck and got down in the left lane. It started spinning, lost control, and then the back of the truck — I mean, the front of the truck, he couldn’t stop fast enough. I mean, he was trying to dodge it. He went to the left side in the median trying ... to pass the car. <5
[Where were] you at the time this happened? Q*
All of it? <¡
Yes, sir. O’
In the median.
So you were right there able to see it all; is that right? C?
Right. <i
When you saw the car [spin] around, what did it do? O’
It slid a little upon it. <$
Did it slide in front of the truck? <3?
All I [saw] is it slid a little. <<
She had lost control of her vehicle? O’
Right. <!
Well, what did the trucker do when the vehicle started sliding? C?
He started cutting his wheels towards the left hand side of the ditch and trying to miss the car.
Q. Okay. Was he able to miss the car?
“A. No.”
Boyd gave a virtually identical account in his deposition:
“Q. Okay. Mr. Boyd, I’d like for you to describe ..., if you would, please, sir, what you observed immediately prior to the accident?
“A. Well, I was going south on 1-65, as I had mentioned. I was coming close to or just past the welcome center, and it was a long, sweeping curve to the left. In front of me, I noticed a semi truck ... in the left-hand lane, and to the right of him was another vehicle. I couldn’t tell exactly what position this vehicle had in reference to the truck, although it looked as though it was beside it, and the vehicle on the right—
“Q. Excuse me just a second. Was it beside it or slightly in front of it?
“A. Well, it looked as thoügh — I mean, in reference to the truck, I couldn’t tell exactly where but, you know, it was beside it or just in front of it, one of the two, you know.
“Q. All right, sir.
“A. But, anyway, the vehicle on the right, the car swerved to the right and then veered to the left in front of the truck. The truck at that time veered to the left onto the median, and it appeared as though he was attempting, you know, to avoid the car. But I don’t see how he could have avoided it with the conditions as they were, because at that time I put on my brakes and noticed that I was driving on almost solid ice, very little braking ability. I started veering to the left and wound up almost at the accident scene.
“Q. How far behind the vehicles were you at the time you noticed the car veer to the left?
“A. How far behind?
“Q. Yes, sir.
*469 “A. I’d estimate 300 to 500 feet, something of that nature.
“Q. Could you see clearly ahead of you at that time?
“A. Oh, yeah. It was dark but the — it was very clear out, no problem seeing. I could see the lights very easily, you know.
“Q. And as I understand your testimony, the car or the automobile veered to the right and then veered in front of the truck; is that correct?
“A. Right, yeah, went to the right and then abruptly went in front of the truck. I lost sight of it at that time when it went in front of the truck because I was directly, you might say, in back of the truck and they were going around a curve to the left.
“Q. What did the truck do in response to the car veering in front of it?
“A. It immediately headed toward the median to the left, you know.
“Q. Did you actually see the collision happen?
“A. No, I didn’t. The car was in front of the truck. I couldn’t see it at that point.
“Q. Where did the vehicles end up following the collision?
“A. Well, the semi truck was on the median, almost entirely on the median in the snow, and I wound up, oh, I would say — when I finally stopped, I was against the embankment, if you will, the plowed snow, on the right-hand side of the snow and almost just in front of the truck and just in back of the vehicle, the automobile. The automobile was perpendicular to the road against the median. The truck was on the median at an angle.”
The trial judge instructed the jury on the “sudden emergency” doctrine. The Nalls argue that the giving of the “sudden emergency” charge was improper because, they say, the facts did not support such a charge. We disagree. For a “sudden emergency” instruction to be appropriate, there must be 1) a “sudden emergency” 2) that is not the fault of the party seeking the instruction. McKinney v. Alabama Power Co., 414 So.2d 938 (Ala.1982). If there is evidence from which the jury could conclude that there was a sudden emergency, then the trial judge should give the instruction and let the jury determine whether the “sudden emergency” doctrine applies. Friedlander v. Hall, 514 So.2d 914 (Ala.1987).
This Court recently affirmed a judgment entered on a verdict for the defendant in a rear-end collision case in Bennett v. Winquest, 564 So.2d 405 (Ala.1990). In that case, the plaintiffs contended, as here, that the giving of the “sudden emergency” charge was erroneous because, they claimed, the facts did not support it. There, the plaintiff was separated from the defendant by one car. When the plaintiff stopped in the right lane of the interstate highway in response to slower traffic ahead, the car between the plaintiff and the defendant crossed over to the left lane and passed the plaintiff’s stopped car. The defendant, who was travelling 60 miles per hour, was unable to avoid hitting the plaintiff’s car from behind, because of oncoming traffic. We held that, based on the facts and circumstances, the question of whether a sudden emergency existed was for the jury and that the jury could have concluded that the plaintiff should not have stopped her car in the traveled portion of the highway when nothing prevented her from proceeding.
Likewise, in this case, we find sufficient evidence to support a conclusion by the jury that Tisdale was faced with a sudden emergency when the Nalls’ car swerved in front of his truck and that, through no fault of his, the two vehicles collided.
The Nalls also argue in their brief that, during their testimony, the amplifying system in the courtroom was not working properly and that for that reason the court should have granted a new trial. However, the record does not establish that factual allegation. Nothing in the original record tended to establish it. Although the sup *470 plemental record contains the affidavit of the bailiff, who stated that one of the jurors indicated that she could not hear La-Wanda Nall’s testimony, the supplemental record also contains the affidavit of another juror who stated that LaWanda Nall’s voice was plainly audible and that she could hear all of the testimony. We find no error in the trial court’s denial of the Nalls’ motion for new trial on that ground.
The judgment in favor of Tisdale and Murray Envelope Corporation is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, ADAMS and INGRAM, JJ., concur.